IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ANTHONY SHEELY, JR., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION FILE |
| v. | ) | |
| | ) | NUMBER 1:14-cv-441-TCB |
| BANK OF AMERICA, N.A., et al., | ) | |
| | ) | |
| Defendants. | ) | |

# O R D E R

This case is before the Court on the motion to dismiss of Defendants Bank of America, N.A. and The Bank of New York Mellon[1] [5].

## I.    Background

Plaintiffs Anthony Sheely, Jr. and Felicia Boyd-Sheely's story is familiar.  In May 2007, they took out a loan from Countrywide Home Loans, Inc. to refinance their home.  This loan was evidenced by a $461,000 note that Anthony Sheely executed in favor of Countrywide.  To

---

[1] The Bank of New York Mellon was formerly known as The Bank of New York, as Trustee for the Certificate-Holders of CWALT, Inc., Alternative Loan Trust 2007-19 Mortgage Pass-Through Certificates, Service 2007-19.

secure payment of the note, the Sheelys (jointly) executed a security deed for their home in favor of Countrywide.

In the security deed, Mortgage Electronic Registration Systems, Inc. is listed as the nominee for Countrywide and its successors and assigns. MERS is also the grantee under the security deed.  In February 2010, MERS assigned the Sheelys' security deed to BAC Home Loans Servicing, LP (formerly Countrywide Home Loans Servicing, LP).   Then in June 2011, BAC assigned their security deed to Defendant Bank of New York Mellon.

For a while, the Sheelys paid their mortgage on time.  But after they suffered a financial setback during the Great Recession, they began to worry about their ability to pay their mortgage.  So in July 2012, they applied for a loan modification from Bank of America.

The Sheelys diligently pursued a modification.  They often spoke with representatives at Bank of America and submitted (and frequently resubmitted) documents to the bank.  At each turn, however, they were denied a modification.

At some point, the Sheelys stopped paying their mortgage, defaulting under the note.  (It is unclear whether they entered default before or after they applied for a modification.)

In December 2012, six months after the Sheelys began the modification process, Bank of New York Mellon sent them a notice of acceleration and foreclosure sale. The notice stated that the sale would take place on February 5, 2013. It also notified them that Bank of America had the authority to negotiate, amend or modify the terms of the loan. For myriad reasons, including three bankruptcy petitions filed by the Sheelys, the foreclosure sale has yet to occur.

Eight days before the scheduled foreclosure sale, Anthony Sheely sent Bank of America a fifteen-page letter titled "Qualified Written Request." In this letter, Sheely demanded a wide range of information and documents, some of which were related to the servicing of his loan. Less than two weeks later, the bank sent two letters in response to Sheely's letter.

In January 2014, the Sheelys filed this action in the Superior Court of Fulton County. Defendants timely removed this action to this Court and now move to dismiss the Sheelys' complaint. Their motion will be granted.

## II.   Legal Standard

A claim will be dismissed under Federal Rule of Civil Procedure 12(b)(6) if the plaintiff does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547

(2007); *Chandler v. Sec'y of Fla. Dep't of Transp.*, 695 F.3d 1194, 1199 (11th

Cir. 2012).  The Supreme Court has explained this standard as follows:

> A claim has facial plausibility when the plaintiff pleads factual
> content that allows the court to draw the reasonable inference
> that the defendant is liable for the misconduct alleged.  The
> plausibility standard is not akin to a "probability requirement,"
> but it asks for more than a sheer possibility that a defendant has
> acted unlawfully.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation omitted);

*Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325 (11th Cir. 2012).  Thus, a claim

will survive a motion to dismiss only if the factual allegations in the

complaint are "enough to raise a right to relief above the speculative level,"

and "a formulaic recitation of the elements of a cause of action will not do."

*Twombly*, 550 U.S. at 555.  And while all well-pleaded facts must be

accepted as true and construed in the light most favorable to the plaintiff,

*Powell v. Thomas*, 643 F.3d 1300, 1302 (11th Cir. 2011), the court need not

accept as true plaintiff's legal conclusions, including those couched as

factual allegations, *Iqbal*, 556 U.S. at 678.  Thus, evaluation of a motion to

dismiss requires two steps: (1) eliminate any allegations in the complaint

that are merely legal conclusions, and (2) where there are well-pleaded

factual allegations, "assume their veracity and . . . determine whether they

plausibly give rise to an entitlement to relief."  *Id.* at 679.

III.   Discussion

The Sheelys assert the following causes of action:

(1)    violations of the Real Estate Settlements and Procedures Act against Bank of America;

(2)    fraud against both Bank of America and Bank of New York Mellon;

(3)    wrongful foreclosure against both Bank of America and Bank of New York Mellon; and

(4)    intentional infliction of emotional distress against Bank of America.

They seek injunctive relief; statutory, actual and punitive damages; and reasonable attorney's fees and costs.

A.    Bank of America's Alleged RESPA Violations

On January 28, 2013, Anthony Sheely sent a letter to Bank of America "requesting a statement of his loan history [and] requesting verification of its proof of claim and various other information related to the servicing of the loan." The Sheelys contend that this letter constitutes a "qualified written request" under RESPA, 12 U.S.C. § 2605(e)(1)(B) (2006 & Supp. V 2012).

Ten days later (counting Saturday and Sunday), Bank of America sent Sheely two letters in response to his request. The Sheelys posit that these

letters "were greatly unresponsive" to his request.  They assert that the bank merely "acknowledged receipt of the QWR and stated that some requests [were] valid and some [were] not and that [it would] treat the loan as enforceable."  Critically, in their view, the bank "refused to answer [Sheely's] questions related to the servicing of the loan."

The Sheelys contend that Bank of America's response (or lack thereof) constitutes a RESPA violation.  As they correctly recognize, when Sheely sent his letter, RESPA required Bank of America to acknowledge receipt of a QWR within twenty days and to respond within sixty days.[2] § 2605(e)(1)(A) & (2).  Bank of America allegedly violated this requirement because it did not "provide the information requested or an explanation of why the information requested [wa]s unavailable or unobtainable within sixty days."

---

[2] Congress amended these deadlines as part of the Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203 § 1463(c), 124 Stat. 1376, 2184 (2010) (codified at 12 U.S.C. § 2605(e)(1)-(2), (4) (2012) (effective Jan. 10, 2014)).  "As of January 10, 2014, servicers have five days to acknowledge receipt of a QWR and thirty days to respond, subject to limited extensions."  *Roth v. CitiMortgage Inc.*, --- F.3d ----, 2014 WL 2853549, at *2 n.3 (2d Cir. June 24, 2014); *accord Berneiki v. CitiMortgage, Inc.*, 708 F.3d 1141, 1145 n.3 (10th Cir. 2013) (explaining that Dodd–Frank shifted responsibility for implementing RESPA from the Department of Housing and Urban Development to the newly created Bureau of Consumer Financial Protection and detailing why this amendment took effect on January 10, 2014); *see generally* Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 Fed. Reg. 10696 (Feb. 14, 2013).

To state a claim for a violation of § 2605(e), the Sheelys must allege facts that show (1) Bank of America was a loan servicer; (2) Bank of America was sent a valid QWR; (3) Bank of America failed to adequately respond within sixty days; and (4) actual damages or an entitlement to statutory damages. *See id.*; *Frazile v. EMC Mortg. Corp.*, 382 F. App'x 833, 836 (11th Cir. 2010).

Bank of America argues that the Sheelys have failed to state a claim under § 2605(e) for three reasons. First, Sheely's January 28 letter does not constitute a QWR. Second, the bank responded to the servicing-related requests in this letter within the statutory period. And third, the Sheelys have not alleged either actual damages or a pattern or practice of noncompliance with § 2605(e). The Court agrees.

RESPA defines a QWR as

written correspondence . . . that—

(i)     includes, or otherwise enables the servicer to identify, the name and account of the borrower; and

(ii)    includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B).

7

The borrower's request must be for "information related to the servicing of the loan." § 2605(e)(1)(A).  Federal regulations confirm that a QWR must include "a statement of the reasons that the borrower believes the account is in error, if applicable, or that provides sufficient detail to the servicer regarding information related to the servicing of the loan sought by the borrower." 12 C.F.R. § 1024.21(e)(2) (2013).

And *servicing* is defined narrowly: "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan . . . and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." § 2605(i)(3); *see also* 12 C.F.R. § 1024.2.

Sheely's fifteen-page letter includes a demand for a loan audit and responses to 166 requests for information or documents—the lion's share of which have nothing to do with the servicing of the loan—on top of the documents (all originals) requested as part of the audit.  His letter also includes a few stray lines about the servicing of the loan.

Bank of America treated these insular requests as QWRs and responded promptly—long before the sixty-day statutory period ended.

The bank provided Sheely with a copy of his loan-transaction history and a payoff statement, confirmed the absence of lender-placed insurance, and informed him that if he sent "correspondence that describe[d] in reasonable detail any facts which support [his] claims regarding the enforceability of the loan documents signed at closing, [the bank would] investigate [his] claims as soon as possible and provide [him] with a detailed written response."

This response does not sate the Sheelys.  In their opposition brief, they contend that it is defective because Bank of America "failed to produce requested documents and to answer [Sheely's] valid servicing questions." These include "documents showing [the bank's] authority to service the loan," "documentation of compensation received for servicing the loan, the location of the original file, names of investors, and whether any investor would approve a foreclosure sale," as well as "information about the securitization of the loan."

As for how these documents and information fall within the narrow statutory and regulatory definitions of *servicing*, the Sheelys never say. Nor do they cite any RESPA statute, any Bureau of Consumer Financial Protection regulation, or any case in support of their theory.  At the same

time, Bank of America cites numerous cases where letters like Sheely's were found to not constitute valid QWRs or to not require the servicer to provide a point-by-point response. *See* [5-1] at 8-9 & n.3. In other words, courts routinely find that such letters cannot support a RESPA claim under § 2605(e).

So too here. Even if Bank of America had to respond to the servicing requests scattered among scores of admittedly irrelevant demands for documents and information,[3] the two letters and supporting documents that the bank sent in response satisfy its RESPA obligations. The Sheelys' RESPA claim will thus be dismissed, and the bank's argument that the Sheelys inadequately pleaded damages need not be considered.

---

[3] As of January 10, 2014, Regulation X provides that servicers need not respond to a borrower's information request that is (1) irrelevant—"not directly related to the borrower's mortgage loan account" or (2) overbroad or unduly burdensome—*overbroad* means requesting "an unreasonable volume of documents or information to the borrower" and *unduly burdensome* means "a diligent servicer could not respond to the information request without either exceeding the maximum time permitted by [12 C.F.R. 1024.36(d)(2) (2014) (effective Jan. 10, 2014)] or incurring costs (or dedicating resources) that would be unreasonable in light of the circumstances." *Id.* § 1024.36(f)(iii)-(iv). That said, where servicers can "reasonably identify a valid information request in a submission that is otherwise overbroad or unduly burdensome," they must respond to it. *Id.* § 1024.36(f)(iv).

B.   Fraud

The Sheelys assert two common-law fraud claims.  The first is against Bank of America for failure to honestly process their loan-modification application.  The second is against Bank of New York Mellon for its false assertion in the notice of acceleration and foreclosure sale that it had the legal authority to exercise the power of sale under the security deed and foreclose on their home.  Neither claim survives.

1.   Bank of America's Alleged Fraud

Paragraph 16 of the complaint summarizes the misleading statements that Bank of America allegedly made to the Sheelys during the loan-modification process.  This account largely consists of vague assertions about the bank's statements; it also lacks specifics about the time, place and person responsible for these statements and is unclear about whether many statements were made orally or in writing.  In any event, this is their story.

Anthony Sheely wanted to lower his mortgage payments, so he applied for a loan modification from Bank of America.  After he and his wife submitted a modification application, the bank told him that "he would have to be behind on his payments for at least three to six months and that

the late payments would not impact his credit because that is how he would meet the criteria for an in-house modification."[4]

Three months later, Bank of America told Sheely that it "had several potential modification programs and that [it] would notify him by mail as to which one he would be considered for."  Nearly six months passed.  The bank then notified Sheely about a modification program, and the Sheelys submitted the necessary paperwork.

The Sheelys frequently inquired about the status of the modification.  On some occasions, Bank of America told them that it had not received or had lost their modification documents, so they had to be resubmitted.  On others, it told them that the person working on their file had left, and when a new person was assigned, the Sheelys had to restart the application process and re-send their modification documents.  Each time the bank requested documents, the Sheelys sent them.  By their count, they did so "no fewer than ten times"—submitting at least two hundred fifty documents, many of which were duplicates of those the bank said it had never received or lost.

---

[4] The complaint is unclear about whether Anthony Sheely was current on his mortgage when the Sheelys first requested a loan modification.

The Sheelys' inquiries were not always met with negative news, however.  In some instances, Bank of America notified them "that they were qualified for the various different modification programs" or that Anthony Sheely had been "approved to begin the modification trial period."  The bank then shifted them into various modification programs.  But they never received a modification.  Each time they would later discover that the program never existed or the criteria were allegedly not met.  Despite actively pursuing a loan modification, the Sheelys learned that their home was slated for a foreclosure sale.[5]  As a result, they "had to rush and file bankruptcy" three times to stop the foreclosure.

In addition to these general allegations, the Sheelys' complaint includes three specific examples of Bank of America's "deceiving and misleading" statements: letters that the bank sent in July 2012, October 2012 and July 2013.

In the first letter, Bank of America thanks Sheely for "beginning the home loan modification process" and  for "providing [his] complete financial information."  The bank then explains that it is "evaluating [his] loan for modification options" and that this process will take about thirty

_____

[5] They received a notice of acceleration and foreclosure sale on December 14, 2012.

days.  And when complete, the bank stated that he would be notified about whether his loan was "approved to begin a Trial Period" or "was not eligible for this program, but may be eligible for other foreclosure prevention alternatives."  The Sheelys allege that they were never contacted about their loan-modification options; instead, they were told to restart the application process.

In the second letter, Bank of America informs Sheely that it has reviewed his loan for the "new principal forgiveness modification program," which it agreed to put in place in a global settlement with the U.S. Department of Justice.  His loan was not eligible for a modification, however, "because [he] did not make all of the required Trial Period Plan payments on time."  The Sheelys aver that they were never notified about the trial period,[6] but had they been—as the first letter promised—they "would have adhered as they were in a desperate situation to save their home."[7]

---

[6] The Sheelys' allegation that they were "never notified . . . that they were approved to begin trial payments" must mean between July and October 2012. Otherwise, this allegation conflicts with their allegation that "[o]n several occasions, [Bank of America] would inform Mr. Sheely that he was approved to begin the modification trial period."

[7] Bank of America's October 2012 letter contains two other important pieces of information.  The first is immediately below the reason for denying his loan-

In the third letter, Bank of America informs Sheely that his loan is ineligible for the "new principal forgiveness modification program"—the same program that the second letter references—because the bank "cannot create an affordable payment without changing the terms of your loan beyond the limits of the program."[8]  The Sheelys allege that the second and third letters conflict: the second letter says that he was approved for the modification program but was denied for failing to make his payments during the trial period (which he was unaware of), whereas the third letter says that his loan was not eligible for the program.

The Sheelys aver that Bank of America intentionally mishandled their modification.  But they do not allege that the bank acted with scienter

---

modification request: "**If you believe our decision is incorrect, you have 30 calendar days from the date of this letter to contact us . . . and provide information to show why our determination of eligibility was in error.**"

The second is further down the same page and concerns foreclosure:

> **Important information about foreclosure -- *Do not ignore any foreclosure notices.***
>
> **Note that during the 30-day period in which you may contact us and provide information which you believe shows our decision is incorrect, we may begin or resume the foreclosure process and even conduct a foreclosure sale. . . .  If a foreclosure sale is scheduled during this 30-day period, do not assume it will be postponed.**

[8] The July 2013 letter contains the same additional important pieces of information as the October 2012 letter.  *See supra* n.7.

generally.  Instead, they support their claim with the affidavits of six former employees and one former contractor of Bank of America.  These affidavits were submitted in support of the plaintiffs' motion for class certification in *In re Bank of America Home Affordable Modification Program (HAMP) Contract Litigation*, M.D.L. No. 10-2193-RWZ (D. Mass. June 7, 2013).[9] Taken together, the affidavits, which are the subject of a Salon.com article that is also attached as an exhibit to the Sheelys' complaint, strongly suggest that Bank of America intentionally engaged in duplicitous conduct during the modification-review process—conduct that mirrors the Sheelys' allegations.

As a result of Bank of America's false representations, the Sheelys aver that they "suffered great losses to their physical and psychological health and to their finances in their attempts to save their home."  They also

---

[9] The motion for class certification was subsequently denied.  *In re Bank of America Home Affordable Modification Program (HAMP) Contract Litigation*, M.D.L. No. 10-2193-RWZ, 2013 WL 4759649, at *15 (D. Mass. Sept. 4, 2013).  But in denying class certification, the district court concluded that

> [t]his case demonstrates the vast frustration that many Americans have felt over the mismanagement of the HAMP modification process. Plaintiffs have plausibly alleged that Bank of America utterly failed to administer its HAMP modifications in a timely and efficient way; that in many cases it lost documents, or pretended it had not reviewed them, or arbitrarily denied permanent modifications.  Plaintiffs' claims may well be meritorious; but they rest on so many individual factual questions that they cannot sensibly be adjudicated on a classwide basis.

*Id.* at *14 (internal citation omitted).

allege that they "wasted several thousand dollars to third party companies offering loan modification services due to [Bank of America's] fraudulent and deceptive acts."

* * *

Bank of America moves to dismiss with prejudice the Sheelys' fraud claim for two reasons: first, their claim is not pleaded with the particularity required by Federal Rule of Civil Procedure 9(b); and second, their claim is barred by the statute of frauds.

### a. Pleading Georgia Common-Law Fraud in Federal Court

To state a claim for fraud under Georgia law, "the [Sheelys] must allege facts showing that [Defendants] knowingly made false statements; that they intended for the [Sheelys] to act or refrain from acting in reliance on those statements; that the [Sheelys] justifiably relied on the false statements; and as a result of their reliance, the [Sheelys] suffered damage. *Wylie v. Denton*, 746 S.E.2d 689, 695 (Ga. Ct. App. 2013).

Rule 9(b) imposes a heightened-pleading standard for fraud claims. To meet this standard, the plaintiff must allege: "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person

responsible for the statement; (3) the content and manner in which these statements misled the plaintiffs; and (4) what the defendants gained by the alleged fraud." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010) (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380-81 (11th Cir. 1997)) (internal quotation marks omitted). "The particularity rule serves an important purpose in fraud actions by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.'" *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988)) (internal quotation marks omitted).

The Sheelys' complaint does not satisfy Rule 9(b).  Aside from the three letters from Bank of America to Sheely, the Sheelys offer only vague generalizations about Bank of America's alleged misrepresentations and when they were made, and no information about who made them.  Indeed, in their opposition brief, they admit that they "do not recall all dates as there were numerous communications with [Bank of America]," nor do they "recall who they spoke to on those many occasions."  And while they acknowledge that Bank of America is a "huge institution with many

employees," they contend that the specific names of the representatives with whom they spoke as well as the dates of these conversations would be obtained through discovery.  Despite not providing such specifics, the Sheelys conclude that they satisfied Rule 9(b) "by stating with particularity the circumstances constituting fraud."

The Sheelys are mistaken.  Indeed, whether their fraud claim is pleaded with the particularity required by Rule 9(b) is not a close question. Although they never say how many times they spoke with Bank of America, a reasonable inference is more than ten.  Yet their complaint has no dates for any call.  Indeed, they offer only a few vague hints about the month in which *some* of these calls might have occurred.[10]  They also do not make

---

[10] In its opening brief, Bank of America observes that "it is not even clear when [the Sheelys] contend they started the loan modification review process."  In their opposition brief, the Sheelys respond that they began the process in July 2012, as evidenced by the first letter from Bank of America.  The complaint thus suggests the following time line:

July 2012
- The Sheelys submit their request for a loan modification.  [1-1] at 9, ¶ 16.
- Bank of America sends the first letter.  This letter confirms that the bank received Sheely's complete application, explains that it is reviewing his modification options, which should take about thirty days, and informs him that he will receive one of three responses once the review is complete.  *Id.* at 10, ¶ 17; *see also id.* at 55.

clear whether each allegedly misleading statement was made orally or in writing.

And while it is plausible that the Sheelys do not remember the name of each representative with whom they spoke during their many calls, their complaint offers no clues about the identity of any of them, such as office location, department of employment, level of authority (e.g., employee or

---

October 2012

- Bank of America tells Sheely that it "had several potential modification programs and that [it] would notify him by mail as to which one he would be considered for."  *Id.* at 9, ¶ 16.

- Bank of America sends the second letter notifying Sheely that it has reviewed his loan for the new principal forgiveness modification program but that his loan did not qualify because he failed to make the required payments during the trial period.  *Id.* at 10, ¶ 18; *see also id.* at 57-58.

December 2012

- The Sheelys receive a notice of acceleration and foreclosure sale. The notice states that the sale is scheduled for February 5, 2013, and that they should contact Bank of America if they have any questions about a loan modification.  *Id.* at 15, ¶ 32; *see also id.* at 130-33.

April 2013

- Bank of America notifies the Sheelys about a loan modification program.  *Id* at 9, ¶ 16.

July 2013

- Bank of America sends the third letter notifying Sheely that his loan did not qualify for the new principal forgiveness modification program.  *Id.* at 11, ¶ 19; *see also id.* at 60-62.

This timeline, however, appears to cover fewer than half of Bank of America's communications with the Sheelys based on paragraph 16 of the complaint.

supervisor), or responsibility for reviewing their modification request.  The absence of any identifying information is particularly jarring because Bank of America's "vicious cycle of misleading" statements allegedly caused them to "los[e] faith in [the bank's] intentions" as well as "hope that they would ever be given a fair and honest chance for their loan to be modified."

In any event, by failing to include the specifics of any of their oral conversations Bank of America, the Sheelys have failed to satisfy Rule 9(b). Their fraud claim will thus be dismissed.[11]

### b.    Statute of Frauds

Bank of America argues that the Sheelys' fraud claim should be dismissed with prejudice because it is barred by the statute of frauds.

In Georgia, "[a]ny contract for sale of lands, or any interest in, or concerning lands" as well as "[a]ny commitment to lend money" is unenforceable unless it is "in writing and signed by the party to be charged therewith."  O.C.G.A. § 13-5-30(4), (7).  The modification of any contract

---

[11] Bank of America argues in its reply brief that the Sheelys' fraud claim should be dismissed with prejudice because they admitted that they did not remember all of the specifics of each communication and that these facts would be revealed in discovery. The Court, however, is not persuaded that the Sheelys cannot plead their fraud claim with specificity based on facts available to them.

covered by the statute of frauds must be in writing.  *RHL Props., LLC v. Neese*, 668 S.E.2d 828, 830 (Ga. Ct. App. 2008).

Also, "one cannot sue in fraud based upon the alleged breach of an oral contract which would itself be unenforceable under the Statute of Frauds."  *Kamat v. Allatoona Fed. Sav. Bank*, 498 S.E.2d 152, 155 (Ga. Ct. App. 1998) (quoting *Studdard v. George D. Warthen Bank*, 427 S.E.2d 58, 59 (Ga. Ct. App. 1993)).  Any agreement to reinstate or modify a home loan must thus be in writing.  *See, e.g.*, *Allen v. Tucker Fed. Bank*, 510 S.E.2d 546, 547 (Ga. Ct. App. 1998) (holding that a claim that the bank orally agreed to reinstate the debtor's mortgage following foreclosure was "untenable in the absence of a written agreement"); *see also Vie v. Wachovia Bank, N.A.*, No. 1:11-cv-3620-RWS, 2012 WL 1156387, at *4 (N.D. Ga. Apr. 6, 2012) (finding that Georgia's statute of frauds rendered any agreement to modify a loan unenforceable because the debtor "failed to make a plausible showing that a valid written modification existed between the parties").  For this reason, this Court has held that a claim for fraud or misrepresentation cannot be based on a lender's oral statements that it would reinstate or modify a loan.  *See Vie*, 2012 WL 1156387, at *3-4.

The statute-of-frauds argument receives scant attention from the parties.  At bottom, the Sheelys contend that their fraud claim does not touch the known third-rails; that is, their claim is not that Bank of America breached an oral contract to grant them a modification or to halt a foreclosure sale pending review of their modification request.[12]  Bank of America's response seems to be that misstatements during the loan-modification process are not actionable in fraud.  Neither side, however, cites any authority that *directly* supports its argument.

Whether the Georgia statute of frauds bars the Sheelys from asserting a fraud claim against Bank of America for promising to review their modification application while knowing that it did not intend to do so is a far closer question than the parties' briefs suggest.  Given the dearth of briefing on this question and the Sheelys' failure to plead their fraud claim against Bank of America with particularity, this question will remain

---

[12] Paragraph 41 of the complaint sets out the Sheelys' theory of fraud: "[Bank of America] knowingly represented that it was processing the documents that [they] sent in for review when [the bank] was in fact not reviewing the documents for a modification."  In their opposition brief, the Sheelys explain that they "expected to be fairly reviewed even if the modification was not granted for a valid reason."  What they did not expect was "to be intentionally lied to many times by [Bank of America] and to be greatly harmed by [the bank's] actions."

unanswered.  Accordingly, the Sheelys' fraud claim against Bank of America will not be dismissed with prejudice.

### 2.   Bank of New York Mellon's Alleged Fraud

The Sheelys allege that the notice of acceleration and foreclosure sale that Bank of New York Mellon sent them in December 2012 was fraudulent. Allegedly, the bank lacked the authority to exercise the power of sale in their security deed because the initial assignment of the security deed from MERS to BAC was invalid.  This, according to the Sheelys, rendered invalid the assignment from BAC to Bank of New York Mellon.  According to the Sheelys, the principal problem with the MERS assignment is that vice presidents of MERS did not execute it.

Even though Bank of New York Mellon (and Bank of America) allegedly knew that the assignment of the security deed was defective, they intended to sell the Sheelys' home at a foreclosure sale.  The Sheelys contend that they "had no reason to know that the assignments were defective and therefore had no reason to fight the attempted foreclosure based on the defective chain of title."

And as a result of Bank of New York Mellon's false statement, the Sheelys claim to have suffered "great psychological, physical, and financial

24

distress" and to have incurred substantial costs associated with this action, which they seek to recover.

The Sheelys' fraud claim based on allegedly false statements in the notice of acceleration and foreclosure sale fails.  For starters, it is unclear whether this claim is made solely against Bank of New York Mellon (which sent the notice and thus made the statement) or both Bank of New York Mellon and Bank of America (because they both allegedly knew that the assignment from MERS to BAC was invalid).  Either way, their claim is meritless.

In their opposition brief, the Sheelys argue that Bank of New York Mellon "cannot prove and has not proven that it is the real party in interest entitled to foreclose here."  Even if this is true, it is beside the point.  To adequately plead fraud, the Sheelys must allege that Bank of New York Mellon lacks the authority to exercise the power of sale in the security deed. And to adjudicate the bank's authority under the security deed entails considering the validity of the security deed's assignments: first from MERS to BAC, and then from BAC to Bank of New York Mellon.  This, however, the Court cannot do.  The Sheelys were neither a party to nor a third-party beneficiary of these assignments and thus lack standing to challenge their

validity.  *See Montgomery v. Bank of Am.*, 740 S.E.2d 434, 438 (Ga. Ct.

App. 2013) (holding that even if the assignment from MERS to BAC was

flawed because it was not executed by the party alleged, "the proper party to

bring a claim against MERS would be the other party to the assignment,

BAC").

Absent standing to challenge the assignments' validity, the Sheelys

cannot establish that Bank of New York Mellon (or Bank of America) made

a false statement in the notice of foreclosure sale—an element of their fraud

claim.  Accordingly, this claim will be dismissed.

### C.    Wrongful Foreclosure

The Sheelys' wrongful-foreclosure claim is premature.  They cite

*Sears Mortgage Corp. v. Leeds Building Products, Inc.*, 464 S.E.2d 907,

909 (Ga. Ct. App. 1995), for the proposition that to state a claim for

wrongful foreclosure, "it is not necessary that the foreclosure be

completed"; instead, it is enough that their property was advertised for sale.

The Georgia Court of Appeals, however, vacated this portion of *Sears

Mortgage* after the Georgia Supreme Court reversed this part of that

opinion.  *See Sears Mortg. Corp. v. Leeds Bldg. Prods., Inc.*, 488 S.E.2d

131, 131 (Ga. Ct. App. 1997) ("Accordingly, our decision is vacated with

respect to Divisions 1 and 2, the judgment of the Supreme Court is made the judgment of this Court with respect to Divisions 1 and 2, and the trial court's judgment is affirmed."). Thus, the portion of *Sears Mortgage* that the Sheelys cite "has no precedential value and does not represent the current state of Georgia law." *Jenkins v. McCalla Raymer, LLC*, 492 F. App'x 968, 972 n.3 (11th Cir. 2012).

Although Georgia has no cases specifically on point, the Eleventh Circuit has noted that "a plaintiff seeking damages for wrongful foreclosure [must] establish that the property at issue was actually sold at foreclosure." *Id.* at 972; *see also* FRANK S. ALEXANDER, GEORGIA REAL ESTATE FINANCE AND FORECLOSURE LAW § 8:11 (West 2013) ("An action for wrongful foreclosure presupposes the completion of a foreclosure sale."). Thus, the Sheelys' claim for damages arising from the alleged wrongful foreclosure of their property is premature and will be dismissed.

\* \* \*

Even if the Sheelys' wrongful-foreclosure claim were ripe, it would fail. To prevail on a wrongful-foreclosure claim, the Sheelys must establish (1) the foreclosing party owed them a legal duty, (2) a breach of that duty, (3) a causal connection between the breach and the injury it caused, and (4)

damages.  *Racette v. Bank of Am., N.A.*, 733 S.E.2d 457, 462 (Ga. Ct. App. 2012).  Breach of a legal duty requires a violation of a foreclosure statute. *McCarter v. Bankers Trust Co.*, 543 S.E.2d 755, 758 (Ga. Ct. App. 2000).

Georgia law provides that "[p]owers of sale in deeds of trust, mortgages, and other instruments shall be strictly construed and shall be fairly exercised."  O.C.G.A. § 23-2-114.  Where a foreclosing party fails to "exercise the power of sale fairly and in good faith," it breaches its legal duty.  *Racette*, 733 S.E.2d at 462 (citing O.C.G.A. § 23-2-144).  In that event, "the debtor may sue for damages for wrongful foreclosure."  *Id.*

"A claim for wrongful exercise of a power of sale under O.C.G.A. § 23-2-114 can arise when the creditor has no legal right to foreclose."  *DeGolyer v. Green Tree Servicing, LLC*, 662 S.E.2d 141, 147 (Ga. Ct. App. 2008) (quoting *Brown v. Freedman*, 474 S.E.2d 73, 75 (Ga. Ct. App. 1996)) (internal quotation marks omitted).  For example, Georgia law permits such a claim "when a creditor forecloses on property without the legal right to do so, in violation of the terms of the deed."  *BAC Home Loans Servicing, L.P. v. Wedereit*, --- S.E.2d ----, 2014 WL 3057179, at *4 (Ga. Ct. App. July 8, 2014).

The Sheelys hang their wrongful-foreclosure claim on an alleged violation of the notice-of-foreclosure statute, O.C.G.A. § 44-14-162.2(a). Their theory implicitly relies on the statute's plain language: "Notice of the initiation of proceedings to exercise a power of sale in a mortgage, security deed, or other lien contract shall be given to the debtor *by the secured creditor* no later than 30 days before the date of the proposed foreclosure." *Id.* (emphasis added).  They contend that Bank of New York Mellon is not a secured creditor because it procured the security deed by fraudulent means and thus the December 2012 notice of acceleration and foreclosure sale that they received from the bank does not comply with § 44-14-162.2(a).

The Sheelys' theory doesn't stop there.  In both their complaint and opposition brief, they claim that Bank of America and Bank of New York Mellon "had a legal duty to ensure that all legal requirements [for foreclosure] were met"; that is, they had to "ensure that the proper party was conducting the foreclosure and giving the required notices under Georgia law."  They assert that the banks failed to comply with this duty. Indeed, in their brief they posit that

> Defendants were aware that the parties executing the alleged
> assignment from MERS to BAC were not Vice Presidents of
> MERS as alleged.  Likewise, Defendants were aware that the
> alleged assignment from BAC to [Bank of New York Mellon]

> was also defective due to the initial defect.  Since the initial
> assignment of the security deed was procured by fraudulent
> means, any subsequent assignment would also be defective.  As
> such, a foreclosure based on an illegal assignment is a wrongful
> foreclosure, and [their] claim is valid.

The Sheelys cite no authority to support their theory that a party seeking to exercise a power of sale in a security deed must ensure that it is "the proper party [to] conduct[ ] the foreclosure"—especially where, as here, the debtors are in default of their obligations secured by the deed; the foreclosing party purchased the security deed for value; and the foreclosing party records its ownership of the security deed before the foreclosure sale. Nor has the Court found any.

To be sure, Georgia law offers limited protections to debtors who have executed a contract that permits a secured party to exercise a power of sale. *See* O.C.G.A. §§ 44-14-160 to -162.4.  But as the Georgia Supreme Court has explained, the "scant statutory law . . . in this area has evolved as a means of providing limited consumer protection while preserving in large measure the traditional freedom of the contracting parties to negotiate the terms of their arrangement"; thus, the law "primarily [consists] of rules governing the manner and content of notice that must be given to a debtor in default

prior to the conduct of a foreclosure sale." *You v. JP Morgan Chase Bank*,

743 S.E.2d 428, 430-31 (Ga. 2013).

Georgia's nonjudicial foreclosure statutes, however, do not define

*secured creditor*, "which is used to signify the foreclosing party." *Id.* at 431.

Thus, when § 44-14-162.2(a) provides that the notice of foreclosure must be

sent by the "secured party," it means the foreclosing party.  But as *You*

makes plain, the most essential aspect of the notice is the name of the party

with the authority to negotiate, amend and modify the terms of the loan.

*See You*, 743 S.E.2d at 433-34.[13]  "The statute requires no more and no

less."  *Id.* at 434.  Indeed, "the required notice [under § 44-14-162.2(a)]

---

[13] Specifically, *You* explains that the question—what does *secured creditor* mean in § 44-14-162(a)?—is answered by the statute's text.

> We need look no further than the plain language of the statute to determine whom the notice must name:
>
>> Such notice shall be in writing [and] shall include the name, address, and telephone number of the individual or entity who shall have full authority to negotiate, amend, and modify all terms of the mortgage with the debtor.
>
> [*Id.* (emphasis added).]  If that individual or entity is the holder of the security deed, then the deed holder must be identified in the notice; if that individual or entity is the note holder, then the note holder must be identified.  If that individual or entity is someone other than the deed holder or the note holder, such as an attorney or servicing agent, then that person or entity must be identified.  The statute requires no more and no less.

*You*, 743 S.E.2d at 433-34.

need not expressly identify the foreclosing party as a 'secured creditor.'" *Id.* at 434 n.7.

Here, the Sheelys aver that the notice of foreclosure sale identifies Bank of America as "the entity with full authority to negotiate, amend, or modify the terms of the loan."  They do not contend that Bank of America lacked such authority;[14] that the notice was untimely; or that they were current on their mortgage.  And yet, they contend that the notice was statutorily defective because the sender—Bank of New York Mellon—acquired the security deed through an invalid assignment.

The Sheelys, however, assert that they are not challenging the validity of the security deed's assignment but rather Bank of New York Mellon's authority to exercise the power of sale under the security deed.  Or as they put it in their opposition brief: "Defendant's use of the fraudulent assignments to initiate a foreclosure on [their] property."  They also point out that even though they were behind on their mortgage, this "does not obviate the requirement for the proper secured party to foreclose."

---

[14] Nor could they; their complaint underscores their unsuccessful efforts to procure a loan modification from Bank of America.

To be sure, "[a] claim for wrongful exercise of a power of sale can be asserted even though a debt is in default."[15] *Brown v. Freedman*, 474 S.E.2d 73, 76 (Ga. Ct. App. 1996). But this is beside the point. The real question is whether Bank of New York Mellon must establish its right to exercise the power of sale under the security deed for its notice of foreclosure sale to satisfy § 44-14-162.2(a). The answer is no.

A notice can satisfy subsection (a) without expressly identifying the secured creditor. *You*, 743 S.E.2d at 434 n.7. This means that the party sending the notice is not necessarily the secured creditor. So even if the Sheelys were correct and the security deed's assignment to Bank of New York Mellon was invalid—despite having never been declared so by any court and the Sheelys' admitted lack of standing to challenge its validity here—this would not *ipso facto* establish a statutory violation.

In the end, the Sheelys did not pay their mortgage. They received a timely notice of foreclosure. This notice provided the contact information of the party with the authority to provide a last-minute modification to

---

[15] Georgia law requires that a party exercising its contractual rights under a power of sale to do so consistent with the terms of the deed to secure debt and to conduct the sale in good faith. *Brown*, 474 S.E.2d at 76. Here, the Sheelys have not alleged that the notice of foreclosure sale is inconsistent with the terms of the security deed or that Bank of New York Mellon plans to conduct the foreclosure sale in bad faith. Their challenge focuses solely on whether the notice complies with § 44-14-162.2(a).

forestall foreclosure.  Bank of New York Mellon thus satisfied its obligations under § 44-14-162.2(a).

The duty that the Sheelys read into this statute—to ensure that the foreclosing party is the proper party to foreclose—has no support in the text or Georgia case law.  Or if there is any, the Sheelys did not cite it in their opposition brief.  Either way, they have not plausibly pleaded that Bank of New York Mellon breached a duty owed to them and thus have failed to state a claim for wrongful foreclosure.

### D.    Intentional Infliction of Emotion Distress

To state a claim for intentional infliction of emotional distress, the Sheelys must show that (1) Bank of America's conduct was intentional or reckless; (2) Bank of America's conduct was extreme and outrageous; (3) a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress was severe.  *Southland Propane, Inc. v. McWhorter*, 720 S.E.2d 270, 276 (Ga. Ct. App. 2011).

The Sheelys have not stated a claim for intentional infliction of emotional distress.  In Georgia, not only must the Sheelys have suffered emotional harm, but that harm must also have been "severe."  Georgia courts have held that

34

> [e]motional distress includes all highly unpleasant mental
> reactions such as fright, horror, grief, shame, humiliation,
> embarrassment, anger, chagrin, disappointment, worry, and
> nausea.  It is only where it is *extreme* that liability arises.  The
> law intervenes only where the distress inflicted is so severe that
> no reasonable (person) could be expected to endure it.

*Id.* at 277 (alterations in original) (quoting *Abdul-Malik v. AirTran
Airways, Inc.*, 678 S.E.2d 555, 560 (Ga. Ct. App. 2009) (internal quotation
marks omitted)) (internal quotation marks omitted).

The Sheelys argue that Bank of America's "actions caused severe
emotional distress to" them.  Anthony Sheely "suffers with severe stress and
high blood pressure that threatens his job."  Felecia Boyd-Sheely, who was
already disabled, now has blood pressure that is so high even the most
potent medicine cannot control it.  Also, the Sheelys "live in fear everyday
of losing their home."

The Court believes that the Sheelys are worried about losing their
home.  And it makes little difference whether this worry started before or
after they began the loan-modification process.  But their "fear" of losing
their home stems from their failure to pay their mortgage.

In their opposition brief, the Sheelys argue that this conclusion
"ignores the fact that [Bank of America] maliciously and wrongly told
[them] to default on their loan."  This claim does not square with the

allegations in the complaint, however.  In paragraph 16, the Sheelys allege that Bank of America told Sheely that "he would have to be behind on his payments for at least three to six months . . . [to] meet the criteria for an in-house modification."  When a bank tells borrowers that to qualify for a modification they have to be behind on their mortgage, it has not told them to stop paying their mortgage.  This unsubtle distinction makes a difference.  And if the Sheelys missed it that is their fault, not Bank of America's.

Moreover, even if the modification process caused the Sheelys some consternation (in the form of higher blood pressure and stress), there is no reason to believe that their distress was so severe that no reasonable person could be expected to endure it.  On the contrary, millions of reasonable Americans have been expected to deal with stress and anxiety of precisely this sort.  The Sheelys are not alone in their suffering.  Their claim for intentional infliction of emotional distress will be dismissed.

### E.    The Sheelys Are Not Entitled to Injunctive Relief

The Sheelys are not entitled to equitable relief.  One of the oldest and most favored maxims of equity is, "He who would have equity must do equity."  O.C.G.A. § 23-1-10.  And Georgia law is well settled that "a debtor

who executed a security deed and defaults on a loan cannot enjoin

foreclosure, or otherwise obtain equitable relief to cancel the deed, unless

the debtor has first paid or tendered the amount due under the loan."

*Edward v. BAC Home Loans Servicing, L.P.*, 534 F. App'x 888, 892 (11th

Cir. 2013) (citing *Taylor, Bean & Whitaker Mortg. Corp. v. Brown*, 583

S.E.2d 844, 846 (Ga. 2003)).  Because the Sheelys have not paid the

mortgage in full, they are not entitled to an interlocutory injunction.

## IV.   Conclusion

Bank of America and Bank of New York Mellon's motion to dismiss

[5] is GRANTED IN PART AND DENIED IN PART.

The Sheelys' claim for

(1)   RESPA violations against Bank of America is DISMISSED
       WITH PREJUDICE;

(2)   fraud against Bank of America is DISMISSED WITHOUT
       PREJUDICE;

(3)   fraud against Bank of New York Mellon is DISMISSED
       WITH PREJUDICE;

(4)   wrongful foreclosure against both Bank of America and
       Bank of New York Mellon is DISMISSED WITHOUT
       PREJUDICE; and

(5)   intentional infliction of emotional distress against Bank of
       America is DISMISSED WITHOUT PREJUDICE.

Additionally, the Sheelys' request for injunctive relief is DENIED.

IT IS SO ORDERED this 11th day of August, 2014.

Timothy C. Batten, Sr.
United States District Judge